Smith v. Thomasville Mr. Smith, we're ready when you are. Good morning, Your Honors. May it please the Court, I am Brenda Eames. I represent the five named plaintiffs in this case. This case involved five plaintiffs who are African-Americans, and they represent the entirety of the African-American workforce in the city of Thomasville Fire Department. They are long-standing employees of the Fire Department who have alleged various discriminatory acts. This matter was handled at the trial level of the counsels, and the defendants filed a motion of summary judgment in which we are here today. The case is based on race and retaliation under Title VII and Section 1981. We got that. It would help me, too, since we've got five plaintiffs, if you would introduce each section of your argument about which plaintiff you're talking about. In other words, if you want to make arguments, you don't have to. You don't waive anything. If you want to make arguments about three of them, start with one. Tell us who you're talking about and make those arguments, and let us ask any questions, and then go to the second one and that sort of thing. Okay. Yes, sir. Let's start with our argument about the retaliation. Retaliation involves Derek Colson. Okay. Colson. Thank you. Okay. Derek Colson and Curtis Bradshaw. Derek Colson and Curtis Bradshaw each filed an EEOC charge alleging race discrimination on August 24, 2011. The trial court stated that there was no temporal proximity of causation between the time that the final... You're talking about the retaliatory action was the reassignment, right? No. The trial court said that was the total retaliatory action. What we're stating that there were other facts that occurred in between that time that also served as retaliatory adverse action that the court did not consider. Such as? Such as. Okay. After they filed it on September 30, the Chief Craw met with Curtis and Bradshaw, sir, Curtis Bradshaw and Derek Colson, and wrote them up, gave them a reprimand, alleging some deficiency in their fire inspection. Hazardous materials and commercial building inspections. Yes. And I didn't understand you to contest in the district court that they weren't... I didn't understand you to take the position in the district court that they weren't behind in the inspections or that they hadn't kept computer records of when they inspected. Am I wrong about that? No, you're not wrong about that. Okay. So they were behind and they hadn't kept records. Why is that not a non-retaliatory reason for taking the action? Well, the problem is this. They have been in this position five years and so has PRAW. They did not have an issue with any of their work until they filed their EEOC charge on August 25, 2011. Before, there was never any problem. After they filed it, all kinds of problems came up about saying you got fire inspection problems. And then in October, the chief called the police department, alleging theft, which caused them to have an investigation of both parties. And then after that... The theft facts seem pretty, at least if the briefs are accurate, seem pretty strong to me. I mean, you had people saying we gave him the money and you had no record of him ever turning the money over. And then as I understood it, his explanation was he gave the money somewhere else other than he was supposed to. And the person to whom he said he gave the money said, no, I didn't get it. He said he gave the money to the chief who said that he alleged that he stole it. So there's a factual question whether did the chief have the money or did the chief who alleged that Colson stole the money? But he wasn't supposed to give the money to the chief. That's what he has been doing. I didn't see that in the brief. And after that, he was arrested. And then in November, he was found that they both were reassigned to another unit. What ever happened to those charges? I know they were pending, the arrest charges, the criminal arrest. I know they were pending at the time of the briefs. Are they still pending? No. The prosecutor dismissed the charges. Okay. So Derek Colson was not prosecuted. And let me ask you one question about this retaliation timeline. Are you, were Colson and Bradshaw aware at all that the chief was disappointed in their fire investigation performance prior to the filing of the EEOC complaint? No. That's basically our argument. All this did not come up until after the filing of the EEOC charge on August 25, 2011. So they knew they had not completed as many as they should have, and they knew they were not keeping computer records, but you're saying the chief had never said anything to them about their fire investigation performance? Well, I wouldn't say that they knew that they had a complete, they knew that whether there was no designated requirement of you must complete this amount, this amount by this certain period of time. Had they completed all of the commercial buildings and things in the city of Thomasville? No, they had not. And, yes, they did know that they had not completed all of the commercial fire inspection build in the city of Thomasville. And they knew they didn't have the records, did they not? They knew they turned the records in. And then there was some that was misplaced, but they said they Misplaced means I thought it was in the desk and it was on the table. They disappeared, did they not? Some of the records, yes. Okay. But perhaps, well, it seems the court is implying whether or not they were justified in the final adverse action of reassigning them. What we're arguing is that none of these issues became an issue until after the charge came about. Every year, I mean, they have evaluation. Nothing came up. The chief never said anything about it. They've been in this position for over five years at the time. So this only became an issue after the chief met with them. I mean, even in September, the chief met with his other senior officers and said, Hey, I know about this retaliation, about this EOC charge they filed. And we need to do some investigation. That's part of his memo. We need to do some reorganization. So in viewing the evidence I thought Colson had been given an evaluation in June of 2011 where he needed to improve. That's when Colson was about filling a position for his lieutenant, needed to pass the test and complete some requirements. Well, he got an evaluation before you're talking about, in June. He said he needed to improve his performance. His performance based upon, they were never, even in that evaluation, they were never told anything about these fire inspections until after August. Even then, the performance improvement did not address the issue of the fire inspection that the chief used to make his final determination to reassign them. If they had never engaged in any protective conduct, everything had run smoothly at the department. Nobody had applied for anything or been demoted or anything like that. You would concede, would you not, that the failure to make more fire and commercial building and hazardous materials inspections and the failure to keep the records was a valid basis for taking some action. The question is the motive behind it and the timing, is it not? The first part of your question, if that was a requirement of a designated amount that must be met and they were told they must meet this amount. Well, they were told to keep records and they didn't keep records on the computers. Then they said that we kept records, but some of them have mysteriously disappeared. That's got to be a ground for what I'm trying to do is focus our inquiry here. Okay. I guess, Your Honor, even if that was a ground for that, no, you didn't do this part of your job duties. Okay. Did you not do these job duties that you require prior to August 25th, 2011, 2010, 2009? That's what I'm talking about. Right. Now we're getting somewhere. Okay. It's a valid basis for taking action, but you can't take an action on a valid basis for an invalid reason. Exactly. I understand. Exactly. That's what we're alleging, that even if they had done all this, the timing from which it took place, and the trial court was based, their decision, his decision rather, solely on the final adverse action of the reassignment of November 25th, 2011, saying that that was beyond three months and it was too long. And what we're contending, Your Honor, that there were other things going on prior to that final decision that the chief made to reassign them that also constituted some retaliatory adverse action building up. In essence, he was building up a case to make that final decision in November, which was close to the EEOC chart. Your Honor, and then as far as the wage discrimination charge, Your Honor, the court did state that. Which plaintiff are we talking about? Okay. I'm about to say. On the wage discrimination, it's all five plaintiffs. Okay. Which would be Colson, Bradshaw, Powell, Smith and Johnson. Well, there are different facts as to each plaintiff. There are different justifications. Yes. The court acknowledged that there were documents within the record that show the various pay scale, pay rate and rate of pay. What we did was take those documents from Document 317 of the defendant's document and extrapolate it from that. Those white counterpart, comparatives rather, who were either hired at the same time they were. I didn't think your chart had the details about how much experience they had as firemen or suppressors or the administrative position. I thought it just had the date of hiring. But, you know, I've never heard of a department that just hires people right out of school and everybody they hire is right out of school as opposed to they were working for another department and they came in or they were working in another town and they came in and so forth. They allege that you don't have enough facts in those charts to compare them, to make them a comparator. Well, Your Honor, what we're alleging is that by saying that, that's their blanket argument. You're shifting the burden then, okay? They don't say, well, hey, this person had more qualification. The person, although he was hired on the same date, he had been a fireman somewhere else. The burden of showing a comparator is on you, not them. Well, we show the comparator in the sense that they're all firefighters. They had to meet the same qualification to become a firefighter at Tunnels Field Fire Department as any other person applying for that job on an entry level. Yeah, but you don't make wage decisions just on bare qualifications except the entry level. And the chart shows, you know, we started with the entry level when they started and then we brought it back for the time period which this case is limited to 2010 to 2014. Well, help me. What's a compensation study adjustment? They did. Well, I know that even happened pretty much after all this got brought up about the discrimination. I presume they went back and looked at these different salaries and things of employees and compared it to the population of the city and other surrounding areas, what firemen make to make that type of adjustment. And adjusted up, not down, right? Yes, they did. And what we're saying that even with adjustments that was made, the five African-American firefighters still made less salary wages than the other firemen. No matter how long they may have worked or what they may have done, they make the list a lower salary at the time of this action than others. But see, you're right now giving us more comparators. You're saying no matter how long they've been here, no matter what their experience, but the issue that's being challenged is that you're just by simply saying these are the salaries, that that's not enough information to compare. You have to know more about, you have to, in this circuit, you have to have a comparator must be nearly identical to the plaintiffs in order to prevent the courts from second-guessing employers' reasonable decisions. And so you're talking about a burden that they might have, but don't you have to get past the initial burden of not just showing a salary discrepancy, but saying, and the reason this salary discrepancy matters is because they had the same amount of job time, they've been firemen for the same period of time, they have the same qualifications, they've received the same certifications. Isn't that where you're falling short on the burden that you have? Well, I think my chart shows that the ones that are used, they were hired at the same time. They had the same time. Hiring at the same time and even having the same title doesn't go, there's more there. You could have two people hired at the same time who have different experience levels. One's been a fireman for two years, one's been a fireman for five years, and they might have the same title and one's about to move into another category, but just giving us the hiring at the same time and the same salary doesn't really dig in enough to let us know that, in fact, there is discrimination. In order to follow up on what the judge is talking about, let's take Michael Manley, for instance. Apparently, he got a compensation study adjustment. He also got an EMT incentive, which was 5%, and he got something called a hazmat incentive that your client did not get, which would make it totally different. They're not comparative. Well, that takes us over to the third argument, that the incentives and the promotions, the department has a history of not allowing these firefighters opportunities that they provided to other firefighters to either get training, get certification, or get promotions. Your chart doesn't show that. I mean, you rely on the chart, and I understand that, and it's permissible. But the problem where it fails is it doesn't show the additional certifications, for example. It doesn't show if there are additional certifications, it's because of discrimination, for example, or test scores, the highest test score under that international firefighter's test, whatever it is. There are several instances here where people got promotions inside the department, therefore more money because the chief, without any contradiction in the record that I can see, the chief always promoted the person with the highest score, which is the safest way to avoid a lawsuit. So if these people were promoted at different rates and into different positions, and the uncontradicted evidence is whenever there were tests given to determine who got the position or the promotion, the chief always gave it to the highest scoring person. I don't see how you can make your case. Well, there's always evidence to that. That was not always the case. The key question is when there were tests. More often than not, that was not the case. But we can't tell from the chart which one's which. Well, I guess that goes into my arguments when I argue about the promotion, showing that. I know you say you didn't tell me whether or not these people did that or did that. Well, in our promotion argument, we're saying that the African-American firefighters didn't have the opportunity to do any of these things. So we can't say that. Let me ask you to do this so we can focus. And I'm not asking you to throw four people under the bus. But pick your best case for wage discrimination, your best plaintiff. And let us look and focus especially on that one after we take the case under submission. And if you make that, we'll look at the others. But if your best one doesn't make it, by definition, the others are not going to make it. I mean, we'll look at all of them. But tell me where we need to look beyond the chart on the best plaintiff's case you've got. Okay. The best one? The best one would be Derek Colson and Alan Powell. Best one will be two. All right. That's fair enough. I understand. And they have problems with Powell that we haven't even talked about yet. But let's get his argument and I'll talk about them with him. Okay. And we'll give you your full five minutes on your reply. Thank you, Your Honor. Mr. Richardson, you have 20 minutes. If you need a couple more, I gave Ms. Umas a couple more. We'll give you two as well. Thank you, Your Honor. Chief Judge Carnes, members of the panel, I'm Tom Richardson. I'm from Macon and I represent the City of Thomasville at Pelez. In June and July of 2011, Derek Colson and Curtis Bradshaw underwent an evaluation with respect to the fire inspection work. They were also notified that they had lost their state certifications. Now, when is that in relation to the? It's before August 25th. Okay. Which was the first EEO, right? Right. And there's both Mr. Colson and Mr. Bradshaw mentioned in their EEOC charts that they were evaluated. So we know that happened. It's also in the Human Resources Director Kay McDonald's notes where they, and I'll go with that in just a minute. The two men met with Fire Chief Croft and HR Director Kim McDonald. They were told that their work was not sufficient. They were not inspecting enough buildings and they were told that instead of receiving merit increases of 3%, they would receive 1.5% at this time. They were provided with benchmarks to achieve and if progress was made, they would receive the other 1.5%. All of which was before the protection. This was prior to any EEOC charges brought by any of the appellants. The record also reflects that the Chief and his command staff were considering in July reorganization of the Fire Department. On August 25, 2011, both Mr. Colson and Mr. Bradshaw submitted virtually identical charges of racial discrimination to the EEOC. They referenced the evaluations and said they had not understood why they were paid less than their white counterparts. They made claims of discrimination against African Americans with respect to promotions, training, and hiring in violation of Title VII. This is the context that we examined their later claim of retaliation because of the filing of the EEOC charges. In October, the Chief met with these two firefighters again. The Chief had learned that a number of businesses, including those with hazardous materials, had not been inspected for years. He told the two gentlemen that they were not meeting the benchmarks and thus they would not be getting the additional 1.5% increase in pay. What were the benchmarks? In other words, I thought the city, you conceded, as you had to, that they couldn't inspect all of them once a year. They couldn't do that. There were multiple, but included among those benchmarks were the inspection criteria and particularly with respect to hazardous materials. But did it give the time how often you'd have to do the inspections? I'm not sure that the benchmarks expressly say that. I do think that they expected each business to be inspected once a year, which hadn't been done for years. I thought, and I didn't understand you to dispute it, that there was no way they could inspect all of them each year. Well, that's certainly what they said. Well, I didn't understand that you disputed that. It may be that the chief, I'm trying to remember if the chief said if you can't cover them all in one year, they should be covered in two years. Well, I didn't understand it to be contingent if you can't. I thought it was conceded that there were 1,000 and something. That's 1,300. Well, that's four a day, more than four a day, because you've got holidays, vacations, and that kind of stuff. That's not much of an inspection on some of these warehouses. I think that's why they were focusing on the ones that were most disappointing were the ones. But what I'm asking you, if you don't know, I understand that. It's a big record. Was there at that time in writing something that said you must do it X number of times during X period? I don't believe that's in the record. So there weren't specific benchmarks about the timing? That's correct. Okay. They wanted to see improvement. On November 14, now this is two and a half months after the EEOC charge, the record shows that both men were transferred from fire inspector to fire suppression, according to the reorganization plan. Both claimed they were demoted, although the annual pay stayed the same. Both now say also that they were demoted at an earlier date in October to support their claim that the transfers occurred closer in time rather than almost three months after the EEOC charges were filed. These facts, in our view, do not support retaliation claims. The employer does not have to relinquish its right to insist on better performance after an EEOC charge has been filed. Their claims fall short because there's no temporal proximity between the EEOC charges and transfers. I thought their argument on that was that the transfers weren't the operative date for the retaliation. It was when the decision was made on the transfers. In my view, the official date was November 14 of the transfers. If somebody takes protected conduct action and the next day you make a decision to transfer, demote, or whatever, and you don't announce it for four months, that's temporal proximity, is it not? That would be temporal proximity. That's their argument. Their argument is under the facts, they made the decision before the actual transfer was announced. All I'm saying is that until the deed is, until the transfer is officially made, it might be undone. It might be any number of things that happen. But it wasn't undone. And if they made the decision not to undo it and they made the decision to do it, rather, if they made the decision to do it one hour after the plaintiffs walked out, the fact that they waited for four months to actually do it after they had made the decision. I mean, suppose they make the decision, let's do it in four months. That way we don't have any temporal proximity. You would concede. That's retaliation. Well, I think that where we go with that is that the chief is given a very legitimate, non-discriminatory justification for the transfers. And, therefore, they've done nothing with that as far as trying to show there's protection. That's a different issue than temporal proximity. Right. It's a stronger position for you, whether it prevails or not is a different question. But it's certainly stronger than temporal proximity. I agree with you. In 2012, three other African-American firefighters, that's Mr. Powell, Mr. Johnson, Mr. Smith, joined in and alleged grievances, most of which had not been made contemporaneous with the claimed offenses. As a matter of fact, I do not recall any of the appellants expressing a grievance or complaint between 2005 when Brian Croft became chief and 2011. Chief Croft obviously is the target of most of the appellants' claims of racial discrimination. But let's look at what he did. In 2005, he writes a memo on behalf of Curtis Bradshaw explaining why he promoted him to life safety educator. In that letter, he said, I am promoting Curtis Bradshaw as my new life safety educator. I had other applicants with more experience and time in the fire service than Curtis. However, teaching skills, dedication to the community, and this department, along with his overall positive attitude, have enabled him to achieve that position. Now, this is shortly after Chief Croft became chief. This is not the person that they have described in their allegations about him. That year, same year, he promoted Derek Colson and developed what was a friendship with him. Chief Croft and his wife had Mr. Colson and his wife to dinner a couple of times. They emailed each other. They kidded with each other about Florida and FSU football. And then later, the chief did err in sending the President Obama aging email. That was racially insensitive and shouldn't have happened. But Mr. Colson said nothing about it for three years until he reported it to the NAACP. And that happened in the year 2011, the same year as those evaluations occurred. What appears clear is the scrutiny applied to Mr. Colson and Mr. Bradshaw about the businesses they were supposed to be inspecting and were not, and the 1.5 percent merit increase were a break point in their relationship with the chief and not the EEOC charges that they brought. Now, the failure to promote claims reviewed under the McDonnell Douglas framework, these claims fail for several reasons. First, they frequently don't show that the person was qualified for the position, either because he's not taken the test as is required for the lieutenant and captain positions, or because some other prerequisite has not been met. Like an arson investigation, you've got to have been to ten arson investigations with a certified arson investigator before you can take the test. This is true of Mr. Colson and Mr. Bradshaw's promotion claims. Mr. Johnson, on the other hand, his promotion claim, he scored the third highest on the captain exam, but that didn't qualify him to be chosen because the chief said, and it's without dispute, that he always selected the person with the top score. Secondly, their claims fail because they cannot show they applied for the position. This is true. Let me ask you, counsel, about what I think your weakest defense is, or their strongest claim, and that is the Powell claim, claim of plaintiff Powell as to the assistant chief position. I'm not talking about interim chief because when the chief leaves, everybody knows there's a chief position. You're talking about when he chose Tim Carnell. Yeah, without any notice to anybody, there was going to be an assistant chief. As I understood your defense, and it seems to me like the district court bought it, is that he didn't apply for it. We've held more than once that the failure to apply is no excuse or defense if the job was not posted or should not have been known through constructive notice to the plaintiff. Now, of course, he had constructive notice on the interim chief because the chief had left. Everybody knew that. They probably knew it the day it happened. But on the assistant chief, which was the creation of a new position, nobody, as I understand it, I'm sorry, he's claimed and there's no evidence to the contrary that nobody knew about that inside the department except the folks who made that decision. So how can his claim be dismissed on the grounds that he didn't apply? Well, and I understand those cases that talk about how you have to inform people about open positions. How? It's just common sense. It's the Vessels versus Atlanta Independent Schools case, the 2005 decision of this court. It said when the employer uses informal procedures for identifying candidates, the plaintiff must demonstrate the employer knew of plaintiff's desire to be considered for the position. Yeah, but A, you can't be informed of it unless you know it's going to exist. I mean, he didn't apply for ombudsman either, but we can't say he wasn't interested in that position if somebody created it in the future. The idea is if the position is out there and it's posted and he doesn't apply for it, he loses because the chief didn't know he was interested in it. But for the chief to create a special position and say, I didn't know that anyone was interested in the previously non-existent position, that just doesn't fly. Right, but you're also talking about a person in Mr. Powell that was a battalion chief at the time and making more money than anybody in the department other than the chief. Therefore what? Therefore, I guess, that the chief wouldn't have thought that he'd be interested in being assistant chief when he already held a position that was being higher paid than that. Yeah, but there's more in positions than just the pay. For example, who's in charge when the chief's gone? Right. The assistant chief. Now, why wouldn't the chief have thought that Powell might have liked to be in charge when he was gone? There may have been several people that might have been interested in that position. Exactly, which is why it should have been posted. I think it's a discretionary position on the part of the chief to sort of fill out the command staff and he had somebody there that he thought would be the best person for him to work with. What we're talking about is a claim of racial discrimination and the defense, I didn't know he was interested when he didn't know to be interested because it was a non-existent position. Right, but I don't think it's a reasonable inference from the facts that you've stated that this is evidence of intentional race discrimination. No, it's evidence of the absence of a defense. Well, I don't think that points to . . . I thought the claim was rejected on the grounds that he hadn't expressed an interest in it and therefore the chief didn't know he was interested in it. I thought that was the sole basis of the response to that and the district court's conclusion. Am I wrong? I'm not quite sure about that. I am. Anyway, as to the wage claims, I think that they are problematic for the appellants in the case because of the things that you all have already pointed out. They don't take into consideration experience, work performance, and as a matter of fact, we had Kay McDonald, the HR director, who's highly trained and qualified for that position. We had her give an affidavit that attaches all of the wage information. Her review of the, just simply, her review of the wage claim says some of the African Americans are paid more than their white counterparts. Some of the white employees are paid more than the black counterparts. Nobody has done an expert statistical analysis of the wage claims taking into account all of the different factors that you would take into to make a determination as to whether there's some inference of race discrimination in that. That just hadn't been done, so I don't think the wage claims can survive. No, but I think what the judge is talking to you about is on page 32 of the order where the claim was dismissed with this language. Powell was already serving as battalion chief and the only position superior to his was that of chief.  Powell, to serve as assistant chief, Powell has presented no evidence Chief Croft knew of his desire to make what otherwise would have been a lateral move. I see that, and all I'm saying is that the chief did not publicize this position to anybody in the department, any of the white firefighters or the African Americans. So I don't think that the conclusion of that is that it's race discrimination. I thought also, and I'm looking, well, I can't tell from your brief, frankly. Yeah, I can tell from your brief. Connell had 10 years less experience than Powell. That's the only objective factor you cite to in your brief. Right. Doesn't that cut the other way? Powell has a decade more experience, and Connell gets the promotion. Isn't that a prima facie case? And you come in with a race-neutral reason, and your race-neutral reason is he never applied? I don't think that that leads you to a reasonable inference that race was the determining factor in that decision. Well, it's a prima facie case, and you've got to come up with a race-neutral explanation. And your only race-neutral explanation that I understand, well, two actually. One is that, well, he didn't apply. We didn't know he was interested. Of course, you didn't tell him, so that doesn't, at least speaking for me, doesn't do it. And the second one was, well, he was already Battalion Chief. So it really wouldn't have been an adverse employment action or the denial of a favorable employment action, but he'd be the boss when the chief wasn't there. And it's, you know, a privilege of the job. The way I look at it is the chief makes a decision that he's going to, he needs an assistant. He's going to pick somebody that he thinks he can work closely with, that he's had good experiences with, and will carry out the duties when he's not there. So he chooses Mr. Connell, doesn't open it up to anybody else, any of the other people in the department. I don't think that that on its face creates reasonable efforts of race discrimination. Well, why didn't you proffer that the chief gets along better with Connell than he does with Powell? I wish I had. And on page 19 of the order, just picking up on the same line of questioning, it says, notably, because he was serving as the Battalion Chief, this is the district court saying, therefore, the assistant chief position would not have been a promotion. And we've talked about that, of course, when the chief's not there, the assistant chief would be in charge, and that arguably makes it a promotion. What were the salary comparisons between assistant chief and battalion chief? All the record shows is that Mr. Powell has a higher salary, which is in the $60,000 range. We don't have Connell's salary in the record that I know of. Yeah, so it's not really he makes a higher salary that he makes a high salary. Well, no, it is in the record that he's the highest paid employee in the department other than the chief. All right, but it isn't in the record that he makes more money than he would make as assistant chief, is it? Or is it? Because Connell is— Yeah, but I assume you pay either on experience alone, which would back up your answer, or on experience plus position, which would not back up your answer. What I'm saying is, I thought the question was, does the record show that Mr. Powell made more than the assistant chief? And it does. Well, it wouldn't have if he'd been assistant chief. So, you know, if your argument is that he wouldn't have gotten a pay raise, do we know that? We know that Mr. Connell did—we don't know that Mr. Powell wouldn't have gotten a pay raise. Yeah, because Powell's been there for 10 years. We know that the position that Mr. Connell took paid less than the battalion chief position. That's all. Is there a salary cap to when the assistant chief position was created? Was there any statement that we're going to pay this salary range? That's not in the record. Don't know that. Anything else, counsel? Well, I just wanted to conclude by saying that District Judge Lawson, I think, painstakingly reviewed every claim and every contention by every party. I believe that he did consider every claim even though several of them would be outside the statute of limitations and that we submitted at the district court level 170 statements of material fact and the appellants agreed with all but 13. That was the record that the judge had before him when he issued his ruling and I believe his ruling is correct and we would urge this court to affirm. Thank you, counsel. Ms. Wiley, five minutes. Thank you, Chief Judge. I just thank him and please support. A few things. As far as the issue of the fire inspections, there is evidence in the record from Connell. He was deposed. He was the assistant fire chief, as you all said, but at some point he got reduced down to the fire inspection position that Bradshaw and Colson held at some point. He testified on page 49 and 50 of his deposition that there was no way you could get all 1,300 inspections done in a year. He himself didn't do it when he held that position. That's what I thought had been established or at least there's evidence to support the non-movement position. Yes, sir. But I thought it was also clear that the chief took the position that they haven't inspected enough and they need to step it up. Well, on that, again, there was no competent evidence presented at all to support that. In fact, Connell testified that there were no benchmarks, that there were a lot of variables that were included. I was talking about after they got called in. Oh, after they got called in. After they got called in, there was some dispute. When they were called in in June of 2011, just to be clear, that was about them losing their certification. As it turns out, Croft and Connell, who were the defendants alleged to have engaged in discriminatory acts, did not submit their certification packages. So part of the reason, the main reason that they filed the EEOC charge. Whatever they got called in on June 15th, I thought it was established, and actually the undisputed facts were that Croft had expressed his concerns with Colson and Bradshaw's performance in fire inspections at that meeting on June 15th. Am I wrong about that? That's what they say, and I think that's a factual matter that's in dispute. I mean, did Colson and Bradshaw testify to the contrary? Their testimony was that they were told that they had lost their certification, such that they could not be eligible to do the job anymore because they lost their state certification. Well, that's not inconsistent with being told you haven't done enough inspections, and where are the records? Correct. And the records, there was testimony about records being missing. Only the five black firefighters, their records went missing mysteriously, and the police were called in. Well, I thought it was, you say only the black firefighters. I thought it was just those two firefighters who had the obligation to keep the records about inspections. Am I wrong about that? There was a host of records that were kept in Chief Powell's, Battalion Chief Powell's office that went missing, and he testified. He called the police to have them come in. So there was an entire swath of files only as it pertained to those five firefighters, for whatever reasons that remain a mystery to this day. And also, too, I think it's important to note that when Colson and Bradshaw were removed from that position, they were replaced by a single white male, Mr. Benton, who had Alzheimer's. I meant to ask opposing counsel about that and just missed it. And he could not drive. So I don't know how anyone who can. He couldn't drive because of the Alzheimer's, right? Early onset of dementia, yes, sir. And so he had to be driven around when he could by the assistant chief. What did the agreed statement of facts say about that? The statement, the agreed? The agreed? Yeah, the 121 out of 123 or whatever it was. The Benson's position has been, well, we've over-exaggerated that claim about Mr. Benton's mental state. They don't offer anything to contradict that. Our position is, based upon Mr. Connell's testimony, yes, he had mental problems. Yes, we had to drive him around in order to get him to the various businesses. And that's in Connell's? Yes, sir. Deposition. Yes, on page 45 he acknowledges that Benton had mental issues and that he could not drive. Let me ask you this. The fact that they were replaced by someone who had early onset, let's take that as established for present purposes. Yes, sir. How does that indicate racial discrimination as opposed to the chief saying we've got to get somebody else in there and he looks around and that's the only guy he can put in there at the time? It negates the argument that Bradshaw and Colson were deficient in not doing the job timely. Because if you put an individual, a single individual, who can't even drive, who relies upon other co-workers to drive him around when they can, which was the assistant police chief, and who's in charge of doing the very important inspections that the chief said needed to be done for the safety of the citizens, well, how can you have someone who's mentally impaired in charge of that? So it negates their proper reason, Your Honor. That's when that is relevant. Bear with me on this, and I know this is irregular, but it's sort of a do-over for me because I've been wondering since I first saw that what their position was on that. I'm going to give you two minutes to respond to my question to him about what in the world are you doing with somebody with early onset doing hazardous materials inspections. Your Honor, there's no evidence at the time that the chief made that decision to put Mr. Conlon in that position that he was suffering from early onset Alzheimer's. Why was he being driven around? He wasn't at the beginning. I think after he put him in that position, and I'm not sure how much, what the timetable is, but later on there's no question he suffered. But at the time he put him in that position, he was not incapable of driving. I got that. We're just going to have to get into the record and dig that out. Counsel, I told you you could respond. Yes, Your Honor. The city's own employee is Conlon. Mr. Benton had to retire early from that position because of his mental issues. Conlon took over that position, and he testified that there was no way he could get all of those benchmarks. There were no benchmarks. I understand that, but I'm focusing on I understood the argument in your brief, maybe misunderstood and misunderstood the argument you were making, is at the time that your two plaintiffs were replaced on the inspection detail, the person who was put to replace them was known to have early onset Alzheimer's. Yes, sir. That is correct. I look at Conlon's deposition. Where else do I look for support for that? My clients, our clients state that in their deposition. How would they know? Your Honor, there's a tele and the fire services. I think it's wild. They all talk. They know they live together. It's a family, Your Honor. Just like every workplace, people talk. Maybe even more so because they live together. Okay. Also, the absence of any Is it in your clients, those two plaintiffs' deposition that, yes, he had early onset Alzheimer's from the get-go? Yes, Your Honor. Also, they have affidavits that came, affidavits that were used to support the response and the motion for summary judgment. Let me just do this, if you all don't mind. Could you file a supplemental letter of briefings? Would seven days be enough? I've just given us the site. This is the early onset Alzheimer's complete discussion because it's not in the briefs complete. Yes, sir. This document, that document, this document, that document. Then, counsel, if you want to respond within seven days, if there's something else in the record pertinent to that narrow question, we would appreciate it because you don't see that much in government work. At least, you don't recognize it much. Thank you for the opportunity. I will also want to add that the successors to those positions received iPads. Our clients were not given iPads to do the work. They had to do everything manually and come back. Is that in the record? I don't remember it from your briefs. Yes, we'll reference that, Your Honor. Okay. Thank you. Thank you so much. Appreciate it. Okay. We'll take that case under submission. Stand in recess until tomorrow morning. All rise.